SOUTHEASTERN GREYHOUND LINES, INC., *v.* FREELS.

(*Knoxville*, September Term, 1940.)

Opinion filed November 23, 1940.

Cooper & Asquith and Francis W. Headman, all of Knoxville, for plaintiff in error.

J. M. Davis, of Wartburg, for defendant in error.

Mr. Justice Chambliss delivered the opinion of the court.

This is an action for damages based on alleged breach of a contract of transportation, in which Freels recovered judgment before a jury of $500, which was affirmed by the Court of Appeals. Freels was a representative of a paint company and he desired to inspect the roof of a high school building at Spring City and go from there on the same day to Dayton to interview the school authorities at that point. Freels lived at Sunbright, which is north of Harriman, and Spring City is between Harriman and Dayton. He interviewed in advance the agent of the Greyhound Lines at Sunbright and explained to him his plans and purposes, and was advised that he could and would sell him a round trip ticket from Sunbright to Dayton, with a stop over going south at Spring City. He purchased this ticket, paying $1.80 for it, got up before day to catch this bus and travelled on it to Spring City and got off there about 11 A. M., and made his inspection of the building, and met the next Greyhound Line bus

going through Spring City south and boarded it, with the intention of resuming his journey to Dayton.

There is conflict in the record as to just what took place, but he testified, and the jury apparently accepted his testimony, as follows:

"A. I waited on the next bus, and it come through Spring City around eleven o'clock, and I got on the bus, and the driver got off, and went back about the back end of the bus, and come back and said, 'Lets see your ticket.' I was still standing up, and I handed it to him, and so he said, 'I can't haul you,' and I said, 'I don't see why you can't, I have got a ticket.' Well, he said, 'I have got instructions from the Company not to pick up anybody between Harriman and Chattanooga,' and I said, 'I can't help what your instructions are, the agent sold me a ticket.' I said, 'I have got to go to Dayton and get back home to-day.' Well, he said, 'I am not going to haul you.' I said, 'I don't see how you can get around hauling me,' I said, 'I have got a ticket, and I just have to go,' and he said, 'Well, I am not going to haul you, no use arguing about it.' He took hold of my arm—didn't knock me down, or kick me off of the bus, but escorted me down the steps, and when I got down, he just held his hand up, stood in the door, like he was afraid I was going to get back on the bus—

"Mr. Kessinger: Object to what it looked like.

"Mr. Davis: Q. Tell what he did. A. That is what he did. Slammed the door in my face and drove off and left me standing there.

"Q. I will ask you if there were people on the bus? A. Yes, sir.

"Q. Was it loaded? A. Yes, sir.

"Q. State whether or not these remarks he made to

you, and leading you out was in the presence of these people on the bus? A. Yes, sir.

"Mr. Kessinger: Object to that testimony, because it does not relate to the breach of this contract.

"The Court: Overruled.

"Mr. Kessinger: Exception.

"Mr. Davis: Q. I want you to state to the jury whether or not you were chagrined and humiliated? A. I was.

"Mr. Kessinger: Object on the same ground.

"The Court: Overruled.

"Mr. Kessinger: Exception.

"Mr. Davis: Q. What did you do, if anything? A. After the bus was gone, I waited around there to see when another bus would be in. Never was on the other bus, and I got to inquiring about the way to go to Dayton, and I finally found a fellow that was going, but he wasn't going for some time, and I told him I would buy him six gallons of gas if he would go then, and he said he would tell me in just a few minutes, and directly he came back and said he believed he would go, so I bought him six gallons of gas.

"Q. What was the expense of that? A. $1.50.

"Q. In other words, you gave $1.50 to go to Dayton? A. Yes, sir."

He further testified that he got to Dayton in this manner and interviewed the parties he had intended to see and returned to his home on the Greyhound Lines that afternoon.

The driver of the bus testified that while he refused passage to Mr. Freels he explained to him fully and informed him that he could shortly ride on the Cherokee bus, etc., that he was not rude or discourteous and did not take hold of the passenger, etc. This was the issue on which the contest was waged, whether or not Mr. Freels

was ejected in such manner as to be unnecessarily humiliating, subjecting him to indignity, etc., thus aggravating the damages. All the circumstances were submitted to the jury.

The defense of the Greyhound Lines is, first, that under a contract which it had with another transportation company, The Cherokee Bus Line, and also pursuant to the permit of the State Utilities Commission, the Southeastern Greyhound Lines had no authority to accept passengers going south to Dayton from any point below Harriman, but that this was the exclusive territory for this purpose of the Cherokee Lines. And, in the second place, it is insisted that, even if Freels was entitled to recover at all for breach of his contract, he was limited to the actual cash outlay incident to the breach, which was the cost of the transportation for which he had to pay from Spring City to Dayton, and it is insisted for the Greyhound Company that the trial Judge erred in submitting the case to the jury on the theory that exemplary or punitive damages could be granted, it being obvious that the sum awarded of $500 must have been upon this basis.

A petition for *certiorari* filed by the Greyhound Company was granted and argument has been heard. The petition was granted mainly in order that the Court might further consider the question of damages, but the case here is open on all questions. However, we have had no difficulty in concuring with the finding of the lower courts on the question of liability for breach of this contract and damages to the extent of the actual loss. We are satisfied with the disposition of this issue by the Court of Appeals and it is unnecessary for us to go into that phase of the case, further than to say that an inspection of the exhibits filed for the defendant Company

does not satisfy us that the limitation upon the authority of the Greyhound Lines to pick up passengers between Harriman and Dayton is so expressed as to embrace a stop-over case of this kind. We are inclined to think that this limitation can more reasonably be related to cases in which the transportation originates at the given intermediate point. Moreover, with respect to the question of the basis and extent of the damages allowed, upon further consideration we are not prepared to disturb the result concurrently arrived at by the two lower courts.

There is abundant authority for the proposition that a carrier violating his contract of carriage is liable for inconvenience, physical suffering and consequent illness resulting to the passenger from the breach. See *Louisville & N. R. R. Co.* v. *Clark,* 205 Ala., 152, 87 So., 676, reported in 14 A. L. R., 695. In 10 Am. Jur., at page 414 (Sec. 1676) it is said, "In actions for breach of contract, damages for mental anguish or mental suffering, where directly attributable to the breach of the contract of transportation, particularly where the conduct of the carrier in contributing to such breach was wanton, or unduly oppressive, may be allowed." In a footnote the following citations are given: *Jones* v. *The Cortes,* 17 Cal., 487, 79 Am. Dec., 142; *Illinois C. R. Co.* v. *Hawkins,* 114 Miss., 110, 74 So., 775, L. R. A., 1917D, 977; *Bonner* v. *Pullman Co.,* 160 S. C., 531, 159 S. E., 382, 76 A. L. R., 922. We quote further from the same text: "In fact, it is said that the tendency of modern authority is to allow damages for mental anguish where it is clearly within the terms of the contract or transaction and was negligently or wantonly caused by the defendant,"—citing *Burrus* v. *Nevada-California-Oregon R. Co.,* 38 Nev., 156, 145 P., 926, L. R. A., 1917D, 750, writ of error dismissed in 244 U. S., 103, 37 S. Ct., 576, 61 L. Ed., 1019.

■ Tennessee appears to be in line with these statements of the rule, with particular emphasis upon the proposition that the question is always for the jury, as to whether or not there was anything in the conduct of the defendant to aggravate the damages and justify the recovery therefor in addition to the actual damages suffered. *Johnson* v. *Perry*, 21 Tenn. (2 Humph.), 569; *Byram* v. *McGuire*, 40 Tenn. (3 Head), 530. The subject is discussed fully in *Grizzard* v. *O'Neill*, 15 Tenn. App., 395, *certiorari* denied by this Court, wherein it is said that the question is always for the jury, citing *Railroad Co.* v. *Satterwhite*, 112 Tenn., 185, 79 S. W., 106, 112, wherein McALISTER, J., quoted with approval the statement that, "punitory damages cannot be claimed as a matter of right; but it is always a question for the jury, within its discretion, no matter what the facts are." In *Knoxville Traction Co.* v. *Lane*, 103 Tenn., 376, at pages 383, 386, 53 S. W., 557, at page 560, 46 L. R. A., 549, the suit was said to be on a breach of contract of carriage, which includes the obligation to transport without injury, insult or indignity. We quote therefrom:

"The defendant insists, further, that this suit is based solely upon injury to the feelings of the plaintiff, and that it was held by this court in the case of *Wadsworth* v. *Telegraph Co.*, 86 Tenn., 695, 8 S. W., 574 [6 Am. St. Rep., 864], that such an action cannot be sustained. The defendant is mistaken in its assumption that this case rests alone upon injury to the feelings of the plaintiff, for the gravamen of this action is the defendant's breach of its contract of carriage, which includes, as has been heretofore stated, the duty to protect the passenger from insult or injury either by its employes or third persons. This contract on the part of the defendant was directly violated by the inexcusable conduct of its servant toward

Mrs. Lane, and the violation of the contract gave her a clear right of action, and entitled her to recover some damages. She may therefore maintain her action to recover all the damages she may show herself to have sustained by reason of the wrongful act of the defendant's agent, including injuries to her feelings and sensibilities, as was held in the case of *Wadsworth* v. *Telegraph Co.*, 86 Tenn. (2 Pickle), [695], 707, 8 S. W., 574 [6 Am. St. Rep., 864].''

Also, see *Louisville, N. & G. S. Railroad* v. *Guinan,* 79 Tenn. (11 Lea), 98, at page 105, 47 Am. Rep., 279, where it is said: ''Although there be neither malice nor fraud, nor intent to oppress on the part of the wrongdoer, yet if the act be done in a rude, insulting or reckless manner, in disregard of social obligations, or with such gross negligence as to amount to positive misconduct, there would be ground for exemplary damages.''

While this Court is unable to find strong support in this case for the allowance of additional damages, in view of these holdings, having particularly in mind that a jury has passed on the question of whether or not the facts and circumstances, taken altogether, justify damages in addition to the actual pecuniary loss shown, and that this verdict of the jury has been approved by the trial Judge and affirmed by the Court of Appeals—so that we have here a concurrent finding on these facts— we feel constrained to affirm the judgment.